**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Crystal Poitra, | ) | |
| | ) | **ORDER DENYING GOVERNMENT'S** |
| Plaintiff, | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:09-cv-048 |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Before the Court is the Government's motion for summary judgment filed on January 31,

2011.  See Docket No. 30.  The Plaintiff filed a response in opposition to the motion on February

21, 2011.  See Docket No. 34.  The Government filed a reply brief on March 4, 2011.  See Docket

No. 36.  The Court denies the motion for the reasons set forth below.


I.      **BACKGROUND**

On December 25, 2007, the plaintiff, Crystal Poitra, delivered her baby at the Quentin N.

Burdick Memorial Health Care Facility ("Burdick Facility"), a federal Indian Health Service medical

facility in Belcourt, North Dakota.  During the delivery of the placenta, Poitra's uterus inverted,

essentially turning inside out.  Dr. Patricia Henry made several attempts to reinsert the uterus but

was unsuccessful.  Poitra was then taken to the operating room where, with the assistance of general

anesthesia, Dr. Henry manually replaced the uterus.  Later that evening, Dr. Pamela Kidd, who had

provided Poitra with prenatal care during her third trimester, took over Poitra's case.  Poitra and her

baby were discharged from the Burdick Facility on December 27, 2007.

On December 30, 2007, Poitra returned to the Burdick Facility with complaints that she was

unable to urinate.  A catheter was inserted and Dr. Kidd performed a pelvic exam and diagnosed a

partial uterine inversion.  After being told of the uterine inversion, either Poitra or her mother requested that Poitra be transferred to another hospital.  Poitra was transferred by ambulance to Altru Health System ("Altru") in Grand Forks, North Dakota.  Dr. Brian Wildey of Altru examined Poitra under anesthesia and confirmed Poitra's uterus was inverted.  After being unable to re-invert the uterus through a laparotomy, Dr. Wildey performed a hysterectomy on Poitra on December 31, 2007.  Poitra was discharged from Altru on January 2, 2008.

On August 21, 2008, Poitra submitted a Form 95 Federal Tort Claim to the Burdick Facility.  See Docket No. 31-22.  On June 29, 2009, the administrative claim was denied.  See Docket No. 31-23.  On August 7, 2009, Poitra filed suit in federal district court against the  Burdick Facility, Dr. Patricia Henry, Dr. Pamela Kidd, and Dr. Richard Larson.  See Docket No. 1.  On September 21, 2009, the United States was substituted as the defendant.  See Docket No. 9.

The amended complaint contends that the Government breached the applicable standards of care and was negligent in numerous ways, including "[f]ailing to obtain Plaintiff's informed consent with respect to the perinatal care provided."  See Docket No. 10.  Poitra contends that she has suffered extensive damages including "extensive past, present and future medical and related expenses; temporary and permanent physical disability and deformities and scarring; and past, present, and future mental and physical pain and suffering and mental anguish."  See Docket No. 10.

On January 31, 2011, the Government filed a motion for summary judgment.  See Docket No. 30.  The Government contends that Poitra failed to exhaust her administrative remedies as to the claim of lack of informed consent, and that Poitra's negligence claim fails as a matter of law.  Poitra contends that genuine issues of material fact exist as to whether she exhausted her

administrative remedies, whether the Government's negligence was a proximate cause of Poitra's injuries, whether Dr. Wildey mismanaged Poitra's treatment, and whether Dr. Wildey's alleged mismanagement was an intervening, superseding cause of Poitra's injuries.


II.     **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to the fact-finder or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the burden of demonstrating an absence of a genuine issue of material fact.  Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

## III.   LEGAL DISCUSSION

Poitra's claim arises under the Federal Tort Claims Act ("FTCA").  28 U.S.C. §§ 1346(b), 2671-2680.  Under the FTCA, the United States waives its sovereign immunity with respect to the following claims:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

### A.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

Under the FTCA, Poitra must first exhaust her administrative remedies before bringing an action against the United States.  28 U.S.C. § 2675(a).  "A federal district court does not have jurisdiction over an FTCA claim unless it was 'first . . . presented to the appropriate federal agency . . . within two years of when the claim accrued.'"  Allen v. United States, 590 F.3d 541, 544 (8th Cir. 2009) (quoting Walker v. United States, 176 F.3d 437, 438 (8th Cir. 1999)).  "Subject matter jurisdiction based upon exhaustion of administrative remedies is a question of law."  In Home Health, Inc. v. Shalala, 272 F.3d 554, 559 (8th Cir. 2001) (citing Bueford v. Resolution Trust Corp., 991 F.2d 481, 484 (8th Cir. 1993)).  The Court is to "liberally construe an administrative charge for exhaustion of remedies purposes," but "there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made."  Parisi v. Boeing Co., 400 F.3d 583, 585 (8th Cir. 2005) (internal citations omitted).

4

Poitra's administrative claim asserts medical negligence.  <u>See</u> Docket No. 31-22, p. 5.  The administrative claim states, in part, that Dr. Henry "forcibly pulled out the placenta, with the uterus still attached, with the Mother screaming in pain. The Doctor continued until she had completely inverted the uterus, pulling it out of her vagina along with the placenta."  <u>See</u> Docket No. 31-22, p. 5.  Dr. Henry's narrative summary dated February 10, 2008, states in part:

> In the third stage of labor patient had some signs of placental separation and with Crede maneuver patient was complaining of increased pain, <u>and was asking not to be touched,</u> and patient gave a maternal expulsive effort as instructed because it was felt that the placenta was likely in the vagina.  At that time it was then noted that there was a larger placental volume than expected, and it was then evidence that there was uterine inversion.  The placenta was largely detached and then was removed, and several attempts were made at replacement of the uterine fundus abdominally, however, these were not successful due to patient discomfort and also inability to get adequate analgesia.

<u>See</u> Docket No. 31-3 (emphasis added).[1]

In <u>Dillon v. United States</u>, 480 F. Supp. 862 (D.S.D. 1979), the court was presented with similar facts in which the plaintiff brought suit under the FTCA to recover for allegedly improper medical treatment at an Indian Health Services hospital.  The court held that the plaintiff's administrative claim which alleged improper treatment and medical services during the course of her gall bladder operation was sufficient to allow the plaintiff to sue on a theory of lack of informed consent.  The court stated:

> The implementing regulation here, 28 C.F.R. § 14.2(a), states that "a claim shall be deemed to have been presented when a Federal agency receives . . . written notification of an Incident. . . ." (Emphasis supplied)  The regulation does not say that every detail of the incident must be supplied, only that the agency be notified that an accident has occurred.

---

[1] While it is unclear which medical records accompanied Poitra's administrative claim, Dr. Henry's summary was part of the medical records from the Burdick Facility.

The agency must then, employing its expertise, investigate the "incident" to determine its responsibility for the injury. Considering the number of similar cases against Indian Health Service that are on file with this Court alone, it cannot be successfully contended that defendant is unaccustomed to the investigation of medical negligence allegations, or that it would not expect that the lack of informed consent could be a possible issue in such a case. It seems clear that, even though plaintiff may not have spelled out every possible fact bearing on her right to recovery in her claim, she did provide defendant with sufficient information under § 2675(a) to enable the agency to conduct a full investigation.

Dillon, 480 F. Supp. at 863.

In actions brought against the United States under the FTCA, the Court is to apply the law of the place where the alleged negligence occurred. Consequently, North Dakota medical malpractice law applies. Under North Dakota law, "the doctrine of informed consent is a form of negligence which essentially relates to a duty of a doctor to disclose pertinent information to a patient." Jaskoviak v. Gruver, 2002 ND 1, ¶ 13, 638 N.W.2d 1 (quoting Fortier v. Traynor, 330 N.W.2d 513, 517 (N.D. 1983)). Poitra alleged medical negligence in her administrative claim. The Court finds that the administrative claim, and the attached medical records submitted in support of the claim, set forth sufficient facts to provide the administrative agency, i.e., Indian Health Services, with sufficient notice of the claim and the potential theories of recovery that a reasonable investigation would disclose, including a claim of lack of informed consent.

The Court concludes that the claimant (Poitra) is not obligated to provide the administrative agency with a preview of her lawsuit and a detailed disclosure of every potential claim and theory of recovery. If the cause of action is fairly implicit in the facts set forth in the administrative claim (the Form 95 Federal Tort Claim), the claim has been "presented" and the agency has sufficient notice to enable it to investigate the claim. See Palay v. United States, 349 F.3d 418, 425-26 (7th Cir. 2003) (holding that a plaintiff is not required to plead legal theories in the administrative claim,

but must "present" his claims in the sense that he set forth the relevant facts in enough detail to alert the agency to the presence of those claims); Burchfield v. United States, 168 F.3d 1252, 1256 (11th Cir. 1999) (holding that all that is required to put an agency on notice "is that the theory put forward in the complaint filed in the district court be based on the facts that are stated in the administrative claim").  The claimant is not required to specifically enumerate all legal theories of recovery in the administrative claim form.

The Court concludes that a claim of lack of informed consent is implicit in the facts set forth in the administrative claim submitted by Poitra, particularly when the claim is given the required liberal construction for exhaustion of remedies purposes.  The Court concludes that Poitra has exhausted her administrative remedies and the Government's motion for summary judgment is denied as to Poitra's claim of lack of informed consent.


**B.    MEDICAL NEGLIGENCE**

In North Dakota, "to establish a prima facie medical malpractice case, the plaintiff must present evidence establishing the applicable standard of care, a violation of that standard, and a causal relationship between the violation and the harm complained of."  Greenwood v. Paracelsus Health Care Corp. of N.D. Inc. Corp., 2001 ND 28, ¶ 10, 622 N.W.2d 195.

Under North Dakota law, an expert opinion is required to maintain a medical negligence action except in obvious cases:

> Any action for injury or death alleging professional negligence by a physician, nurse, hospital . . . must be dismissed without prejudice on motion unless the plaintiff serves upon the defendant an affidavit containing an admissible expert opinion to support a prima facie case of professional negligence within three months of the commencement of the action. . . . This section does not apply to unintentional failure to remove a foreign substance from within the body of a patient, or performance of

> a medical procedure upon the wrong patient, organ, limb, or other part of the
> patient's body, or other obvious occurrence.

N.D.C.C. § 28-01-46.  "The statute 'attempts to minimize frivolous claims by requiring the plaintiff

to produce an expert opinion to support the allegations of negligence in the early stages of

litigation.'"  Van Klootwyk v. Baptist Home, Inc., 2003 ND 112, ¶ 10, 665 N.W.2d 679 (quoting

Haugenoe v. Bambrick, 2003 ND 92, ¶ 10, 663 N.W.2d 175).

On August 7, 2009, Poitra filed a complaint in federal district court.  See Docket No. 1.  On

November 4, 2009, Poitra filed an "Affidavit of Bennett S. Walstatter, MD, FACOG."  See Docket

No. 13.  Dr. Walstatter's affidavit states in part:

> 4.  That after having reviewed the hospital, pre-natal records, and materials
> for the index pregnancy, I have concluded that the applicable standards of care
> were not met with respect to the treatment rendered to Crystal Poitra by the Defendant
> doctors and hospital, individually and through their employees and staff, which
> ultimately resulted in an unnecessary hysterectomy which would have been avoided
> if Crystal Poitra would have had appropriate follow-up care in the post partum period
> in the hospital and in the office.  It is my opinion to a reasonable degree of medical
> certainty that this hysterectomy and subsequent inability to have children would have
> been avoided.
>
> 5.  Specifically, I have reviewed the medical records of Crystal Poitra.  I
> believe there has been a breach of the standard of care in the management of her
> care.
> . . .
>
> That based upon my training, experience, education, and my preliminary
> review of the applicable medical records, the Defendant breached the applicable
> standards of care in one or more of the following particulars:
>
> A.  Failing to take timely and appropriately utilize the patient's history and
> physical examination;
>
> B.  Failure to appropriately evaluate and treat patient's complaints;
>
> C.  Failure to take prompt remedial measures to prevent, minimize or correct
> signs and symptoms of actual or impending delivery problems;

D.  Failing to timely utilize proper diagnostic testing in the circumstances;

E.  Failing to have proper policies and procedures or failing to enforce procedures to prevent this result including but not limited to:

1.  taking adequate steps to timely respond to matters when they presented;

2.  assuring that a proper and prompt patient assessment is done by a qualified practitioner;

3.  having the patient immediately evaluated by the required specialist; and

4.  assuring that emergency treatment would be done in a timely fashion.

F.  Failing to timely and properly evaluate, anticipate, diagnose and treat the patient's complications including but not limited to the uterine inversion during the delivery of her child.

See Docket No. 13.

North Dakota case law "generally requires that the plaintiff establish through expert testimony the degree of care and skill required of a physician, and whether specified acts fall below that standard of care." Jaskoviak v. Gruver, 2002 ND 1, ¶ 12, 638 N.W.2d 1 (quoting Greenwood, 2001 ND 28, ¶ 13, 622 N.W.2d 195).  While "trial courts should be extremely cautious in entering summary judgment in medical malpractice cases because of a lack of expert testimony," summary judgment may be appropriate if the plaintiff failed to indicate she has or will be able to obtain expert medical opinion to support her allegations and the defendant met the requirement of showing no genuine issue of fact exists.  Id. (quoting Winkjer v. Herr, 277 N.W.2d 579, 585 (N.D. 1979)).

The Government contends that Poitra cannot establish medical negligence as a matter of law. The Government argues that (1) Poitra's medical negligence claim lacks expert opinion establishing a causal link between the alleged breach of the standard of the care by the Government; and (2)

Poitra's hysterectomy was a result of the mismanagement of her care by a third party which acts as an intervening, superseding cause.

      1)      **CAUSATION**

Dr. Walstatter testified in his deposition regarding the breach of the medical standard of care:

      Q.      Is the applying – let's assume for the sake of this lawsuit that [Dr. Henry] was applying traction at the time that the placenta delivered.

      Was that a breach of the medical standard of care?

      A.      If the patient said stop, yes, then she should not have done that. Patient was too uncomfortable and uncooperative, yes. So I would say that that was a breach of the medical standard of care. She did not have patient consent.

      Q.      Let me ask you another hypothetical. Let's assume for the sake of this lawsuit that the patient didn't say stop and that Dr. Henry proceeded in the same manner as you are suggesting.

      Would that be a breach of the standard of care?

      A.      Hypothetically, no, it would not be.

      Q.      It is appropriate to apply cord traction in the course of the third stage of delivery; is that correct?

      A.      It can be, yes.

. . . .

      Q.      So your contention is the breach of the standard of care is not the technique that the doctor applied but the fact that consent was withdrawn; correct?

      A.      That's correct.

. . . .

      Q.      What causes uterine inversion?

> A.      Don't know.  Traction probably, increased pressure.  I have never seen a spontaneous.  Usually it's from non-separation or non-total, sub-total separation of the placenta with pressure with – with traction that brings the placenta down with the attached fundus which is somewhat thinned out from being enlarged by the pregnancy and therefore can be prolapsed.

See Docket No. 31-26, pp. 11-12.  Dr. Walstatter further testified as to his opinions:

> Q.      Doctor, could you tell me about your opinions in this case?  You have indicated that you believe there was a breach of the standard of care because Dr. Henry did not have consent to proceed with the delivery of the placenta during the course of the third stage of labor, correct?

> A.      Yes.

> Q.      Are there any other opinions that you formed in this case that relate to the standard of care or the breach of the standard of care?

> A.      My opinion on the breach of the standard of care is that Dr. Henry did not have consent to continue to deliver the placenta.

> At that point, if she had stopped, she could have either gotten the patient's consent to finish the procedure, in which case she probably would have still had the inversion but would have had patient's consent;

> Secondly, she could have taken the patient to the operating room with patient's consent for the delivery of the placenta while the patient is asleep, do a manual removal of the placenta, which she said was already separating in her opinion, and would have not had the inversion if she had done it that way.

> What she ended up with was an inversion of the uterus that she was required to take the patient back to the operating room in order to reduce that inversion.  It could have been prevented.  Or, if she had patient's consent, then she would not have been deviating from the standard of care.

> Q.      So in your opinion there are two ways that the breach of the standard of care could have been avoided.  One is to obtain additional consent, or, two, to proceed into the operating room and perform the delivery of the placenta in the operating room; correct?

> A.      Again, the patient's consent.

See Docket No. 31-26, p. 14.

Dr. Walstatter stated that his opinions include the opinions he listed in his expert report "[w]ith the additional fact that there was no informed consent to go ahead with the delivery of the placenta which apparently was inadvertently left out of this report."  See Docket No. 31-27, p. 1. Dr. Walstatter said, "Now, had there been consent for the removal of the uterus -- correction -- removal of the placenta without going to the operating room, but consented, then this would not have been a deviation of the standard of care and just a series of unfortunate events."  See Docket No. 31-27, p. 3.  Dr. Walstatter further testified that Poitra "should have been evaluated to determine whether or not the cervix was closed, whether or not the inversion had been reduced and had stayed un-inverted" before being discharged from the Burdick Facility and that this was also a breach of the standard of care.  See Docket No. 31-27, pp. 3-4.

Even without a claim of lack of informed consent, there remain genuine issues of material fact as to Poitra's claims of medical negligence.  While the Government contends that the deposition of Poitra's expert witness, Dr. Walstatter, only supports a claim of lack of informed consent, Dr. Walstatter's deposition testimony could also be reasonably interpreted to support other claims of professional negligence.  When viewed in a light most favorable to the non-moving party (Poitra), there remain genuine issues of material fact to be resolved.

## 2)   INTERVENING, SUPERSEDING CAUSE

The Government also argues that the hysterectomy Poitra underwent at Altru Health Systems in Grand Forks constitutes an intervening, superseding cause.  "To relieve a defendant of the responsibility for the consequences of his negligence, an intervening cause must be one that is both independent and unforeseeable.  Champagne v. United States, 513 N.W.2d 75, 81 (N.D. 1994)

(citing Lang v. Wonnenberg, 455 N.W.2d 832, 837 (N.D. 1990)).  The North Dakota Supreme Court

described the standard for determining the existence of an intervening cause as follows:

> The determination of whether an intervening force is the efficient cause of an injury
> involves a number of considerations including whether or not the intervening cause
> is an extraordinary one or one which might be normally expected by a reasonable
> person in view of the situation existing at the time of its intervention. . . . The
> foreseeability of the act of the unknown person in this case is the crucial point of the
> sufficiency of the evidence.

Haugenoe v. Workforce Safety & Ins., 2008 ND 78, ¶ 36, 748 N.W.2d 378 (quoting State v.

Columbus Hall Ass'n, 27 N.W.2d 664, 668 (1947)).  "[I]ssues of causation and foreseeability are

generally questions of fact, not matters of law."  Id. at ¶ 37.

Poitra's expert witness, Dr. Walstatter, testified that he does "not believe that anything that

Dr. Wildey had done caused the necessity for the hysterectomy."  See Docket No. 31-27, p. 7.  The

record reveals that the uterus may have been partially necrotic when Dr. Wildey examined Poitra

at Altru.  Dr. Wildey states in his operative report that "most likely, a hysterectomy was in need

because when I did look at the fundus through the vagina, there was already some necrosis on the

top of the fundus."  See Docket No. 31-18.  Dr. Wildey testified that "necrosis" is a term used when

tissue cells are not being perfused with blood and start to die.  See Docket No. 31-19, p. 96.  Dr.

Wildey testified that during the laparotomy, "I saw the inside of the uterus that looked necrotic and

I saw the outside of the uterus, which looked blanched.  Both of which are an abnormal uterus."  See

Docket No. 31-19, p. 108.  He defined "blanched" as "lacking blood supply, white."  See Docket

No. 31-19, p. 108.

The record also reveals that the uterus may have remained inverted from the time of Poitra's

stay in the Burdick Facility until the hysterectomy was performed nearly a week later.  Dr. Wildey

stated in his operative report that "it was grossly evident that the uterus had remained inverted.  The

patient had undergone treatment for uterine inversion up in Belcourt 5 days ago, and it just did not appear that the uterus has fully returned to its proper position." <u>See</u> Docket No. 31-18.  Dr. Wildey was asked about this report in his deposition:

> Q.      Do you believe that the uterus remained inverted from the time of the initial inversion all the way until the time you saw her?
>
> A.      You would never know.  Clinically that's what it appears to have happened.
>
> Q.      And why do you say that?
>
> A.      Because you had a history of an inversion, they thought that they had got it reverted.  She returned back to her, to her caregiver's office.  They felt something in there, the baby's head coming out (indicating).
>
> Sent her to me, I do an exam under anesthesia, I grab hold of this mass and it's, in fact, the fundus, hence still an inverted uterus.

<u>See</u> Docket No. 31-19, pp. 99-100.  Dr. Walstatter could not state to a reasonable degree of medical certainty whether the uterus was still inverted or had re-inverted when Poitra returned to the Burdick Facility on December 30, 2007.  <u>See</u> Docket No. 31-27, p. 3.  Dr. Walstatter further testified, "Everything that happened after the inversion would have been avoided had the inversion not occurred." <u>See</u> Docket No. 31-27, p. 3.

Whether Poitra's hysterectomy resulted from the mismanagement of her care by a third party is a fact question best left for trial.  There are genuine issues of material fact as to causation and foreseeability which preclude the granting of summary judgment at this stage.

## IV.     <u>CONCLUSION</u>

The Government's motion for summary judgment (Docket No. 30) is **DENIED**.  The Court finds that the plaintiff, Crystal Poitra, exhausted her administrative remedies as to all claims of

14

medical negligence and there remains genuine issues of material fact as to liability, causation, and

damages, if any, to be resolved at trial.

**IT IS SO ORDERED.**

Dated this 4th day of April, 2011.

/s/ Daniel L. Hovland
Daniel L. Hovland, District Judge
United States District Court

15